**RANGER INSURANCE CO.
and Avemco Insurance
Co., Plaintiffs,**

v.

**Robert KOVACH, et al., Defendants.**

**No. 3:96CV02421 (EBB).**

United States District Court,
D. Connecticut.

June 22, 1999.

Paul A. Lange, Offices of Paul Lange, Stratford, CT, for plaintiff.

Arthur B. Harris, Charles Samuel Harris, Harris & Harris, Louis S. Ciccarello, Lovejoy & Rimer, Norwalk, CT, for defendant.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ELLEN B. BURNS, Senior District Judge.

Plaintiffs Ranger Insurance Company ("Ranger") and Avemco Insurance Company ("Avemco") filed suit in this court seeking (1) a declaratory judgment to determine Ranger's liability under an aviation insurance policy; (2) a determination that Ranger's insurance policy with the Defendant Kovach was void ab initio; (3)

a determination that Ranger is entitled to reimbursement for payments made and expenses incurred under the insurance policy; (4) a determination that Ranger and Avemco are entitled to reimbursement from Kovach under a promissory note; and (5) a determination that Ranger and Avemco are entitled to reimbursement from the Estate of Elisabeth Goulston under the promissory note. Pending before the Court are cross motions for summary judgment pursuant to FED. R.CIV.P. 56 on all counts of the complaint. Jurisdiction exists pursuant to 28 U.S.C. §§ 1332 and 2201. For the reasons set forth below, the Plaintiffs' Motion for Summary Judgment (Doc. No. 84) is GRANTED. The Defendants' Motion for Summary Judgment (Doc. No. 94) is DENIED.

## I. Statement of Facts

The Court summarizes only those facts believed necessary to an understanding of the issues in, and the decisions rendered on, these motions. The facts are culled from the affidavits, depositions, answers to interrogatories and other exhibits submitted by both parties. Unless otherwise indicated, these facts are not in dispute between the parties.

This case arises out of the April 12, 1995 crash in Danbury, Connecticut, of a Piper Aerostar multi-engine aircraft, registration number N602PC (the "Aircraft"), owned and operated by Robert Kovach. Present on board the Aircraft at the time of the accident were Kovach, Elisabeth Goulston, Fritz Leisse and Ingrid Leisse. As a result of the crash, all aboard were injured. Although Goulston initially survived the crash, she died as a result of the injuries sustained therein on May 1, 1995.

In May 1994, Kovach and Goulston arranged to finance a major portion of the Aircraft's purchase price through Cornerstone Bank ("Cornerstone"). This financing was secured by a promissory note (the "Note"). On May 23, 1994, both Kovach and Goulston signed the Note as borrowers.

Also in May 1994, Kovach looked for insurance coverage for the Aircraft. He chose Benchmark Insurance Services, Inc. ("Benchmark"), to act as his insurance agent. Kovach spoke to Arthur Bossler of Benchmark, who recommended the Ranger Insurance Company. All of Kovach's discussions concerning the aircraft insurance policy were with Bossler. He never spoke to any employee of Ranger or of Avemco.

Bossler gave Kovach an Aircraft Insurance Application form ("insurance application") to be completed in order to obtain an insurance policy from Ranger. In completing the form, any questions that Kovach had he reviewed with Bossler. In addition, Bossler recommended a company to finance the premium payments.

Kovach claims to have discussed fully with Bossler his prior history of flying to include the fact that he had previously improperly completed an application for a medical certificate which resulted in a revocation of his medical certificate and a 30 day suspension of his license by the FAA. The application for a medical certificate was improperly completed because more than ten years prior to its completion, Kovach had been convicted of a criminal offense and failed to disclose this information. Kovach filed a corrected application for a medical certificate which was granted and his license was reinstated after the 30 day suspension.

Question M on the insurance application asked: "Has any pilot named above had any convictions, suspensions, or revocations for: FAR [Federal Aviation Regulations] violations, use or possession of drugs, or reckless or drunk driving?" Kovach claims to have discussed this question with Bossler in relation to his prior suspension. In reliance upon Bossler's advice that the question related primarily to alcohol and drugs, that the medical certificate infraction was of minor significance and that the box for that question should be

checked "no," Kovach checked the box accordingly. Kovach also stated in the application that: "I/We authorize Benchmark Insurance Services, Inc., to represent me/us in placing this insurance."

Ranger provided Kovach with aircraft insurance under policy number GA41490 (the "Policy"). The Policy was issued through Ranger's aviation manager, Signal Aviation Underwriters, Inc., with an effective period of May 18, 1994 through May 18, 1995. Issuance of the Policy and determination of the premium were based on information contained in the application. The Policy provided combined single limit bodily injury and property damage liability coverage, with policy limits of $100,000 each person and $1,000,000 each occurrence. After evaluating Kovach's application, Ranger decided to offer him the Policy with an annual premium of $3,275.

The Policy's Coverage Identification Page contains a specific provision (Item 9) concerning "the pilot flying the aircraft." Item 9 refers the reader to "See Endorsement Number 1." Endorsement Number 1 is titled "Pilot Endorsement" and states that it changes Item 9 of the Coverage Identification Page. The Policy also states in at least three other places that coverage will not be provided if the requirements in Item 9 of the Coverage Identification Page are not met.

In addition to the coverages previously set forth, the Policy contains a lienholder's endorsement in favor of Cornerstone Bank. Following the accident, Ranger paid Cornerstone $135,000 pursuant to the lienholder's endorsement.

A separate policy was issued to Cornerstone by Plaintiff Avemco. This policy covered Cornerstone directly for the difference between what Kovach owed Cornerstone on the Note, less what Ranger would pay Cornerstone on the lienholder's endorsement in the event of a total loss. Avemco paid Cornerstone $15,852.10 upon its policy. After the aforementioned payments by the Plaintiff insurers, Cornerstone provided a joint, full assignment of the Note to both Ranger and Avemco.

By virtue of filing this action, Ranger demanded payment from Kovach pursuant to the terms and conditions of the Policy. In addition, Ranger and Avemco also made a joint demand to Kovach for payment upon the terms and conditions of the Note. Ranger and Avemco also made a joint demand to the Estate of Elisabeth Goulston for payment upon the terms and conditions of the Note.

On April 12, 1995, Kovach operated the aircraft on an Instrument Flight Rules ("IFR") flight plan from Washington Dulles International Airport, Chantilly, Virginia, to Danbury Municipal Airport, Danbury, Connecticut, where the aircraft crashed. Kovach acted as pilot in command of that flight. At the time of the aforementioned flight, Kovach held a private pilot certificate issued by the Federal Aviation Administration ("FAA") with ratings for airplane single and multi-engine land as well as instrument airplanes. A restriction on Kovach's airman certificate, however, stated that his operation of multi-engine aircraft was limited to Visual Flight Rules ("VFR") only.

Kovach filed and activated an IFR flight plan prior to departing from Dulles on April 12, 1995. When filing the IFR flight plan, Kovach stated that the pilot in command of the intended flight from Dulles to Danbury was Daniel Southard which in fact was not the truth.

Shortly after takeoff, Kovach entered clouds and during the flight to Danbury experienced occasional cloud penetration. While attempting to land the Aircraft at Danbury, Kovach attempted to do a go around and in the process the aircraft crashed.

As a result of this accident, the FAA revoked Kovach's airman certificate on an emergency basis for the following reasons:

(1) making a fraudulent or intentionally false entry in a record or report (the IFR flight plan);

(2) improperly operating an aircraft below the authorized minimum descent altitude ("MDA");

(3) operating an aircraft in a careless and/or reckless manner so as to endanger the lives and property of others; and

(4) serving in the capacity of an airman in violation of a term of his airman certificate.

(Ex. 8, Pls' Supp. to Mot. Summ. Judg.)

In response to the aforementioned Order, Kovach surrendered his airman certificate to the FAA by letter dated June 1, 1995. (Ex. 9, Pls' Supp. to Mot. Summ. Judg.)

The Leisse's brought personal injury actions against Kovach in the Superior Court of the State of Connecticut. Ranger provided a defense to Kovach in those cases pursuant to a reservation of rights and ultimately settled the claims. Goulston's estate is currently being probated in Connecticut and the executrix is Margaret Raczkovy. Goulston is survived by adult children Oliver Goulston, Larwin Goulston and Claudia Goulston, who have sought recovery from Kovach pursuant to Ranger's Policy. By complaint dated April 7, 1997, the Estate of Elisabeth Goulston brought a wrongful death action against Kovach in the Superior Court of the State of Connecticut. Ranger is providing Kovach with a defense in that action pursuant to a reservation of rights.

## II. Legal Analysis

### A. Standard of Review

Summary judgment pursuant to Federal Rule of Civil Procedure 56(c) is appropriate if the Court finds, after viewing the facts in the light most favorable to the non-moving party, that there is no genuine issue of material fact pertaining to a given issue, and that the moving party is entitled to judgment as a matter of law on that issue. The burden is on the moving party to show that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987). A dispute over a material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The court's role in considering summary judgment is not to resolve disputed issues, but only to determine the existence of factual issues to be tried. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### B. Policy Coverage

The Plaintiff Ranger first argues that the Policy issued to Kovach does not afford coverage for the aircraft accident at issue (the "Accident"). Specifically, Ranger argues that Kovach was operating the Aircraft under an IFR flight plan and under Instrument Meteorological Conditions ("IMC") when he was not licensed by the FAA to do so. The Policy requires in a number of places that Kovach is to have the appropriate license for each flight he decides to undertake in order for that particular flight to be covered. Kovach's airman certificate indicates that he was licensed to fly the Aircraft insured under VFR only. (Ex. 7, Pls' Supp. to Mot. Summ. Judg.) Therefore, Ranger argues that the Policy did not cover the flight and subsequent crash at issue.

The defendants respond by arguing that the Policy does cover the flight and accident in question. In support, the following claims are made: (1) Kovach operated the aircraft under VFR before and at the time of the accident and under the authority of the control tower at Danbury Airport; (2) there must be a causal connection between the claimed non-compliance with the Policy provisions and the accident itself; (3) the

terms of the policy are ambiguous; and (4) the FAA did not issue a license to Kovach to fly under IFR conditions due to the fraud, forgery and deceit of a third party.

There is no dispute that Kovach filed and activated an IFR flight plan for the flight in question. There is also no dispute that in filing the IFR flight plan Kovach gave a name other than his own as the pilot in charge. Kovach has also admitted to flying under IMC during parts of the flight. (Kovach Ans. to Interrog. # 11,[1] Ex. 6, Pls' Supp. to Mot. Summ. Judg.) Section 61.3(e) of the Federal Aviation Regulations states:

> No person may act as pilot in command of a civil aircraft under IFR or in weather conditions less than the minimums prescribed for VFR flight unless that person holds:
>
> (1) The appropriate aircraft category, class, type (if required), and instrument rating on that person's pilot certificate for any airplane, helicopter, or powered-lift being flown . . . .

14 C.F.R. § 61.3(e)(1).

It is also a fact that Kovach did not have the appropriate certificate from the FAA to fly this aircraft under IFR or in weather conditions less than the minimums prescribed for VFR flight. In addition, there is no evidence that Kovach ever canceled his IFR flight plan as required by 14 C.F.R. § 91.169. The facts establish that Kovach operated the flight in question under an IFR flight plan and under weather conditions less than VFR minimums for which he did not hold a proper license issued by the FAA as required by regulation.

Kovach first argues that upon reaching Danbury he had four miles of visibility, could see the airport and runway, and received permission from the Danbury control tower to land under VFR conditions.[2] Neither party has produced evidence demonstrating what the precise meteorological conditions were at the time Kovach ·attempted to land the plane. Accepting Kovach's assertion that he could see the airport and runway does not support his claim that he was given permission to land under VFR conditions. In fact, the evidence produced by Kovach in support of this claim contradicts rather than supports his assertion.

The Defendants produced a transcript of the Danbury control tower covering the time of Kovach's approach, attempted landing and crash. (Ex. 17, Ds' Supp. to Mot. Summ. Judg.) They also produced statements from three air traffic control specialists who were on duty at Danbury on April 12, 1995, and witnessed the approach and crash of the aircraft. (Id.) These exhibits support the fact that Kovach was operating under an IFR flight plan. The transcript and statements also support the fact that Kovach was on the localizer approach to runway 8,[3] that while

---

1. Interrogatory # 11 asked: "Were you in IFR conditions as defined in 14 C.F.R. § 1.1 at any point during the flight? If so, please state when and where you encountered IFR conditions and when and where you left IFR conditions?" Response: "Yes, in IFR conditions on departure when climbed through clouds, then occasional cloud penetration and lastly, upon descent in Danbury M.D.A."

2. In an affidavit submitted by Kovach, he states the following: "Just before the accident I witnessed several planes land under conditions which the control tower *must have* approved as visual conditions. (Emphasis added.) Upon approaching Danbury airport, the airport and the surrounding countryside be-

came visible for a distance of approximately four miles for a period of about four minutes, I was able to observe landing area and surrounding countryside prior to 'touch down' on the landing field. Prior to attempting to land I reported to the air control tower at Danbury that I was about to land under visual conditions and requested permission to do so. The permission was granted." (Kovach Affidavit, Ex. 2, Defs' Supp. Opp. to Summ. Judg.) The transcript of the control tower does not support this assertion.

3. A localizer approach allows aircraft to make instrument landings. The reference to runway 8 indicates which runway at Danbury the aircraft was attempting to land on.

he was cleared to land[4] he never canceled his IFR flight plan and that he attempted a go around prior to crashing. (Id.)

■ Even assuming for purposes of summary judgment that the weather conditions at Danbury were sufficient to allow Kovach to fly under VFR, the fact remains that Kovach never canceled the IFR flight plan filed and activated at Dulles; therefore, the flight was never operated under *Visual Flight Rules* regardless of the weather conditions existing at the time of the accident. Thus, the flight in question was conducted in violation of the specific terms of the Policy. The Court agrees with the Plaintiffs' assertion that the Defendants confuse operating an aircraft under IFR regulations with operating an aircraft in IFR conditions[5] (IMC), as well as operating under VFR regulations and VFR conditions. An aircraft can be flown under IFR regulations, while in weather conditions that would allow it to be flown under VFR regulations. The difference is the rules that apply to govern that flight (IFR or VFR).

The Defendants next argue that there must be a causal connection between the crash and the claimed violation of the Policy in order for there to be no coverage under the Policy. Specifically, the Defendants argue that there must be a causal connection between Kovach's lack of FAA certification and the crash.

In support of this argument the Defendants cite *Bayers v. Omni Aviation Managers Inc.*, 510 F.Supp. 1204 (D.Mont. 1981). *Bayers* involved an airplane crash in which the pilot did not have a valid medical certificate as required by the terms of the policy. The court concluded that because there was no causal connection between the accident and the pilot's lack of a valid medical certificate, the insurer could not avoid coverage. *Bayers* represents the minority position.

■ The majority view does not require a causal connection between the accident and the breach of a policy term or provision. *See, e.g., Bequette v. National Ins. Underwriters, Inc.*, 429 F.2d 896 (9th Cir. 1970) (applying Alaska law); *Security Ins. Co. v. Andersen*, 158 Ariz. 426, 763 P.2d 246 (1988); *National Union Fire Ins. Co. v. Meyer*, 192 Cal.App.3d 866, 237 Cal. Rptr. 632 (1987); *National Ins. Underwriters v. Mark*, 704 F.Supp. 1033 (D.Colo. 1989); *Hollywood Flying Serv., Inc. v. Compass Ins. Co.*, 597 F.2d 507 (5th Cir. 1979); *Florida Power & Light Co. v. Foremost Ins. Co.*, 433 So.2d 536 (Fla.Dist.Ct. App.1983); *Grigsby v. Houston Fire & Casualty Co.*, 113 Ga.App. 572, 148 S.E.2d 925 (1966); *Roberts v. Underwriters at Lloyds London*, 195 F.Supp. 168 (D.Idaho 1961); *Johnson v. Security Ins. Co.*, 135 Ill.App.3d 690, 90 Ill.Dec. 352, 481 N.E.2d 1263, (1985); *American States Ins. Co. v. Byerly Aviation, Inc.*, 456 F.Supp. 967 (S.D.Ill.1978); *Western Food Prods., v. U.S. Fire Ins. Co.*, 10 Kan.App.2d 375, 699 P.2d 579 (1985); *Arnold v. Globe Indem. Co.*, 416 F.2d 119 (6th Cir.1969); *U.S. Fire Ins. Co. v. West Monroe Charter Service*, 504 So.2d 93 (La.App.Ct.), *writ denied*, 505 So.2d 1141 (La.1987); *Aetna Casualty & Sur. Co. v. Urner*, 264 Md. 660, 287 A.2d 764 (1972); *Edmonds v. United States*, 642 F.2d 877 (1st Cir.1981) (applying Massachusetts law); *Kilburn v. Union Marine & Gen. Ins. Co.*, 326 Mich. 115, 40 N.W.2d 90 (1949); *Omaha Sky Divers Parachute Club, Inc. v. Ranger Ins. Co.*, 189 Neb. 610, 204 N.W.2d 162 (1973); *Hedges Enter., Inc. v. Fireman's Fund Ins. Co.*, 34 Misc.2d 249, 225 N.Y.S.2d 779 (1962); *Security Mut. Casualty Co. v. O'Brien*, 99 N.M. 638, 662 P.2d 639 (1983); *Bellefonte Underwriters Ins. Co. v. Alfa Aviation, Inc.*, 61 N.C.App. 544, 300 S.E.2d 877 (1983), *aff'd*, 310 N.C. 471, 312 S.E.2d 426

4. These exhibits do not support Kovach's claim that he was cleared to land under VFR when in fact he remained under IFR because he did not cancel his IFR flight plan.

5. The Federal Aviation Regulations define "IFR conditions" as "weather conditions below the minimum for flight under visual flight rules." 14 C.F.R. § 1.1.

(1984); *American Continental Ins. Co. v. Gerkens,* 69 Ohio App.3d 697, 591 N.E.2d 774 (1990); *Avemco Ins. Co. v. White,* 841 P.2d 588 (Okla.1992); *Ochs v. Avemco Ins. Co.,* 54 Or.App. 768, 636 P.2d 421 (1981), *petition for review denied,* 292 Or. 450, 644 P.2d 1128 (1982); *DiSanto v. Enstrom Helicopter Corp.,* 489 F.Supp. 1352 (E.D.Pa.1980); *United States Fire Ins. Co. v. Producciones Padosa, Inc.,* 835 F.2d 950 (1st Cir.1987) (applying Puerto Rico law); *Economic Aero Club, Inc. v. Avemco,* 540 N.W.2d 644 (S.D.1995); *Powell Val. Elec. Co-op. v. United States Aviation Underwriters, Inc.,* 179 F.Supp. 616 (W.D.Va. 1959).

"There is, however, some divergence of view among the several courts that have dealt with the question whether, as a matter of public policy, an insurer should be allowed to rely on an explicit provision of its insurance policy that denied coverage, like a pilot qualification clause, when the loss was not caused by a breach of that policy condition. The majority view is that the insurer is entitled to rely on a policy provision that unambiguously makes coverage dependent on the pilot of the aircraft meeting particular experience standards. *See Annotation, Aviation Insurance: Causal link between breach of policy provisions and accident as requisite to avoid insurer' liability* 48 A.L.R.4th 778, 801–806 (1986 & Supp. 1990)." *U.S. Aviation Underwriters, Inc. v. Cash Air, Inc.,* 409 Mass. 694, 568 N.E.2d 1150, 1152 (1991). This Court will follow the majority view.

This Court must now determine whether the policy provision unambiguously denies coverage under the undisputed facts of this case. "An insurance company has the same right as any other party to a contract to state the terms upon which it shall be obligated, provided those terms do not contravene statutory requirements or public policy." *London & Lancashire Indemnity Co. v. Duryea,* 143 Conn. 53, 58, 119 A.2d 325 (1955). "Public policy does not favor the forfeiture of insurance coverage based on the insured's technical violation of the insurance policy. [*Byerly Aviation, Inc.,*] 456 F.Supp. at 968–70; *AVEMCO Ins. Co. v. Chung,* 388 F.Supp. 142, 147 (D.Hawai'i 1975).... Courts should be careful in the implementation of this policy, however, to avoid undue disruption of the parties' settled expectations and the purposes for coverage as expressed or implied in the insurance policy." *O'Connor v. Proprietors Ins. Co.,* 696 P.2d 282, 285 (Colo.1985).

▪ Under Connecticut law, "[i]tis the function of the court to construe the provisions of the contract of insurance.... An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy.... If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.... If the insurance language is defined in terms that are ambiguous, such ambiguity is ... resolved against the insurance company.... However, a court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meaning." *Hammer v. Lumberman's Mut. Cas. Co.,* 214 Conn. 573, 583–84, 573 A.2d 699 (1990) (Citations omitted; internal quotation marks omitted).

The Defendants argue that an ambiguity exists in the Policy. They argue that Item 9 as changed by the Pilot Endorsement is ambiguous. Item 9 as changed by the endorsement is as follows:

9. THE PILOT FLYING THE AIRCRAFT:

The aircraft must be operated in flight only by a person shown below who must have a current and proper (1) medical certificate and (2) pilot certificate with necessary ratings as required by the FAA for each flight. There is no coverage under the policy if the pilot does not meet these requirements: [6]

A. PILOTS HAVING A CURRENT PRIVATE OR COMMERCIAL CERTIFICATE, WITH A MULTIENGINE AND INSTRUMENT RATING AND A MINIMUM OF

2,000 LOGGED PILOT HOURS, OF WHICH AT LEAST

1,000 HOURS HAVE BEEN LOGGED IN MULTIENGINE AIRCRAFT, INCLUDING AT LEAST

50 HOURS LOGGED IN THE SAME MAKE AND MODEL AIRCRAFT WE COVER IN ITEM 5.

EACH PILOT MUST SUCCESSFULLY COMPLETE THE GROUND AND FLIGHT TRAINING SCHOOL CONDUCTED BY THE MANUFACTURER, OR ITS EQUIVALENT, IN THE SAME MAKE AND MODEL AIRCRAFT WE COVER IN ITEM 5, PRIOR TO SOLO.

B. ROBERT KOVACH, PROVIDED HE SUCCESSFULLY COMPLETES THE GROUND AND FLIGHT TRAINING SCHOOL CONDUCTED BY THE MANUFACTURER, OR ITS EQUIVALENT, IN THE SAME MAKE AND MODEL AIRCRAFT WE COVER IN ITEM 5, PRIOR TO SOLO.

(Ex. 16, Pls' Supp. to Mot. Summ. Judg.)

Specifically, the Defendants appear to argue that subparagraph B should control in contrast to subparagraph A or the face of the policy. The Defendants contend that because subparagraph B specifically mentions Kovach, coverage is provided to him if he completes the training specified. Although the Defendants admit that every pilot had to be licensed, they contend that Kovach was licensed. The Defendants fur-

ther contend that the only proper interpretation of this provision is that by completing the training specified, Kovach would (1) meet the requirements for an FAA approved license, and (2) satisfy the requirements of Ranger. The Court disagrees.

■ The provision is clear and unambiguous. It clearly states that the aircraft may only be operated in flight [7] by a person who "must have a current and proper (1) medical certificate and (2) pilot certificate with necessary ratings as required by the FAA for each flight." Subparagraphs A and B then impose certain additional requirements on the pilots operating this aircraft.

The Defendants are correct in arguing that, as between the two subparagraphs, Kovach only had to satisfy the additional requirements of subparagraph B. Therefore, in order for Kovach to have coverage under the Policy for the flight in question he was required to have (1) a current and proper medical certificate, (2) a current and proper certificate from the FAA that allowed multi-engine operation with an IFR rating, and (3) successfully completed the ground and flight training school conducted by the manufacturer, or its equivalent, for that type of aircraft. The Defendants' contention that simply completing the training school provided coverage under the Policy regardless of whether Kovach had the proper FAA certification for the flight in question is absurd. To agree with the Defendants' interpretation would require this Court to "torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Hammer*, 214 Conn. at 584, 573 A.2d 699.

■ The Defendants' final argument is that although the FAA did not issue a certificate authorizing Kovach to fly a multi-engine aircraft under IFR, it would have

---

6. Item 9 of the Coverage Identification Page contains this identical language without the additional requirements labeled "A" and "B."

7. The Policy provides the following definition for the term "in flight" as used in the Policy: "In flight means when the aircraft movement begins for takeoff until completion of the landing run."

done so had it not been for the fraud, deceit and forgery of a third party, Jeffrey Helm, and that an insurance company should not be able to evade its responsibilities because of the fraud, forgery and deceit of a third party. Additionally, the Defendants contend that Kovach had sufficient flight instruction and testing to have warranted the FAA issuing him a permanent certificate to fly under IFR.

Specifically, the Defendants claim that on or about May 30, 1990, Kovach took an instrument flight test ("check ride") with Helm, passed, and was issued a temporary airman certificate authorizing flights under IFR. Helm then altered the copy of the temporary certificate that was to be forwarded to the FAA for permanent certification. Helm altered the certificate to include a limitation on Kovach to multi-engine aircraft flights under VFR only. This action was concealed from Kovach. Therefore, Helms' alteration resulted in the FAA issuing Kovach a permanent certification with a VFR limitation.[8]

The following additional facts are undisputed. The exhibits produced by the Defendants in support of this argument demonstrate the following. In early May of 1990, Kovach took an instrument flight test in order to obtain his instrument rating to allow him to operate a multi-engine aircraft under IFR. He failed the test.

As part of the test, Kovach completed an Airman Certificate and/or Rating Application (the "rating application"). One of the requirements of the rating application is to obtain the recommendation and signature of the applicant's flight instructor. After the test, the flight examiner signs the rating application indicating the result of the test. For the failed test, the rating application contained the signatures of Phillip Carothers as Kovach's flight instructor and Clifford Robbins as the flight examiner.

On or about May 30, 1990, Kovach apparently took another test and passed. This rating application contained the signatures of Ronald Rheaume as Kovach's flight instructor and Helm as the flight examiner. Kovach states in an affidavit that, prior to taking the examination with Helm, he also took flight instruction from Helm, but that he never received instruction from Rheaume. (Kovach Affid. Ex. 4, Defs' Supp. to Mot. Summ. Judg.)

These arguments are irrelevant. Nothing the Defendants have alleged contradicts the fact that the FAA issued Kovach a permanent certificate containing a limitation to his operation of multi-engine aircraft to VFR only.[9] The only information before the FAA concerning Kovach's ability to fly a multi-engine aircraft under IFR was that he was not qualified to do so. Furthermore, the Defendants' contentions that Kovach was otherwise qualified to fly under IFR are unsupported by the evidence they produced. The evidence shows that Kovach failed a test on or about May 3, 1990. In addition, the Defendants' memorandum points out that "FAA regulations prohibit an instructor of a pilot from testing this same pilot." This fact raises an issue as to the validity of the test Kovach claims to have passed administered by Helm, who also instructed him.

8. Kovach claims that upon receipt of the permanent certificate from the FAA, Goulston asked him to sign it, he complied and asked her to place it in his wallet. He contends that he never read the permanent license and assumed that it was identical to the temporary certificate he received from Helm. It was not until after the accident at issue in this case that Kovach claims he learned that he was not licensed to fly under IFR or IFR conditions. Even assuming this fact is true, the Court finds it immaterial.

9. The Defendants attempt to argue that the permanent license issued by the FAA is inadmissible into evidence because it was an altered document. There is no evidence produced to support this claim. The only evidence the Defendants produced concerning any alteration was to the temporary certificate issued by Helm. The Defendants' claim is meritless.

184

This appears to be in violation of the regulations.

The Court further notes that at oral argument on these motions, the Defendants' counsel stated that Kovach was unaware at the time of the flight with Helm on or about May 30, 1990, that he was taking an instrument check ride. Again, this raises a question as to the validity of the test Kovach allegedly passed.[10]

The Court finds little merit in the Defendants' arguments and concludes that there are no material facts in dispute and that the flight in issue was not covered under the terms of the Policy.

## C. Policy is void ab initio

The Plaintiffs also claim that the Policy is void ab initio due to Kovach's material misrepresentation on the application for insurance. Specifically, the Plaintiffs contend that, when Kovach answered "no" to Question M on the insurance application form, he knowingly made a material misrepresentation that was relied upon by Ranger in making its determination of Kovach's coverage.

In response, the Defendants argue that the Policy is not void ab initio because Kovach answered the question after disclosing to Benchmark the facts surrounding his prior revocation for a FAR violation, and in reliance on Benchmark's assertion that this was insignificant. Further, the Defendants claim that Benchmark was the agent for both Kovach and Ranger, and, therefore, notice to the agent is notice to the principal.

"[T]he three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. Restatement (Second), 1 Agency § 1, comment b (1958)." *Hallas v. Boehmke and Dobosz, Inc.,* 239 Conn. 658, 673, 686 A.2d 491 (1997) (quoting *Gateway Co. v. DiNoia,* 232 Conn. 223, 240, 654 A.2d 342 (1995)).

The Defendants' claim that Benchmark was also the agent of Ranger is unavailing. In support, the Defendants make several assertions that fail to sustain their claim. Among them is the assertion that because Ranger supplied Benchmark with the application form it gave Kovach to complete, it was the agent of Ranger. While this may be the law in Louisiana,[11] the Defendants have failed to cite, and the Court has not found, any authority for this proposition in Connecticut. This Court declines to adopt this proposition as the law in Connecticut. Doing so "would effectively make agents out of all independent insurance brokers." *Id.* at 675 n. 16, 686 A.2d 491. There is no evidence to support a finding that any of the three elements necessary to find an agency relationship existed.

Even applying the law of apparent authority fails to show that Benchmark was acting as the agent for Ranger under the facts of this case. "Apparent authority must be derived not from the acts of the agent but from the acts of his principal. [T]he acts of the principal must be such that (1) the principal held the agent out as

---

10. The Court also notes that upon receiving from the FAA its Emergency Order of Revocation, Kovach returned his pilot certificate. Accompanying his certificate was a letter he wrote to Amy L. Corbett, Assistant Chief Counsel, FAA. In this letter, Kovach stated: "I know that it was not your decision solely to revoke my certificate and I am not angry at anybody but myself for being so foolish. It would have been very simple to have taken the multi check ride. Why I didn't was only

procrastination." (Ex. 8, Pls' Supp. to Mot. Summ. Judg.)

11. The Defendants cite to Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 18.02[c] (8th ed.1995), which in turn cites to *Tiner v. Aetna Life Ins. Co.,* 291 So.2d 774 (La.1974), in support of this proposition.

possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority." *Id.* at 674, 686 A.2d 491.

Again, the Defendants' claim is unsupported. Nothing the Defendants produced identifies an act of Ranger that would support the belief that Benchmark had any authority to act on Ranger's behalf. The undisputed facts clearly demonstrate that Benchmark was the agent of Kovach and not Ranger; therefore, any information learned by Benchmark from Kovach was not imputed to Ranger.

■ "Under Connecticut law, an insurance policy may be voided by the insurer if the applicant made '[m]aterial representations ... relied on by the company, which were untrue and known by the assured to be untrue when made.' *State Bank & Trust Co. v. Connecticut Gen. Life Ins. Co.*, 109 Conn. 67, 72, 145 A. 565, 567 (1929)." *Pinette v. Assurance Co. of America*, 52 F.3d 407, 409 (2d Cir.1995). "[T]he party seeking to rescind need not demonstrate that the other party's misrepresentations were made intentionally, provided that they are material to the contract." *Munroe v. Great American Ins. Co.*, 234 Conn. 182, 188 n. 4, 661 A.2d 581 (1995). In order for Ranger to prevail and rescind the policy, it must prove three elements: (1) a misrepresentation or untrue statement by Kovach which was (2) knowingly made and (3) material to Ranger's decision to insure. *Pinette*, 52 F.3d at 409.

■ "For a material misrepresentation to render a contract voidable under Connecticut law, the misrepresenting party must know that he is making a false statement. 'Innocent' misrepresentations— those made because of ignorance, mistake, or negligence—are *not* sufficient grounds for recission.... When Connecticut courts

speak of 'innocent' misrepresentations, they generally have in mind the situation in which the applicant does not know that the information he is providing is false." *Id.* at 409–10.

■ Kovach states that Benchmark advised him that Question M "related primarily to alcohol and drugs and that the infraction which had occurred ... was of minor significance." (Kovach affidavit.) Relying on Benchmark's advice, Kovach answered no to the question.

The circumstances of this case are different than those in *Lazar v. Metropolitan Life Ins. Co.*, 290 F.Supp. 179 (D.Conn. 1968). In that case, the insurance agent was the agent of the defendant insurer and personally entered the negative answer on the application. The plaintiffs were told by the agent that a question on the application was not designed to elicit the type of information they had revealed to the agent. The court concluded that an issue of material fact existed and stated:

> [R]elying on the agent's explanation and perhaps honestly believing the question related only to consultations that revealed physical abnormalities, Mr. Lazar assented to the negative answer. Assuming the truth of these allegations, as we must, it would be permissible for the trier to infer that Mr. Lazar's answer at the time he made it was not knowingly false.

*Id.* at 181.

In this case, the Defendants do not allege that Kovach's answer was within the framework of the question as explained by Benchmark. Rather, Kovach acknowledges that with regard to Question M, he was informed that the infraction he did not reveal to Ranger was of "minor significance," and not that it was of no significance. In addition, Kovach does not claim that Question M exclusively concerned alcohol and drugs, but rather it "primarily related to alcohol and drugs." Therefore, this Court concludes that Kovach made a

knowing misrepresentation in answering Question M in the negative.

**■** "Under Connecticut law, a misrepresentation is material 'when, in the judgment of reasonably careful and intelligent persons, it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium.' *Davis Scofield Co. v. Agricultural Ins. Co.,* 109 Conn. 673, 678, 145 A. 38, 40 (1929); *see also Pacific Indem. Co. v. Golden,* 985 F.2d 51, 56 (2d Cir.1993)." *Pinette,* 52 F.3d at 411. "Furthermore, Connecticut caselaw strongly suggests that an answer to a question on an insurance application is presumptively material." *Id.*

In support of their claim, the Plaintiffs submitted an affidavit from the leading underwriter at Signal Aviation Underwriters, Inc. ("Signal"), the aviation manager for Ranger. The affidavit states that Signal's underwriting guidelines require (1) the denial of an insurance application whenever an applicant has a history of having one or more certificates revoked by the FAA due to falsification; (2) a detailed review of the factual circumstances surrounding an FAA violation of an applicant; and (3) the charging of a higher premium if insurance is offered at all whenever an applicant has a history of having a certificate revoked by the FAA. Finally, the affidavit states that after reviewing Kovach's application, "I can unequivocally state that the premium charged Robert Kovach would have been significantly higher, if insurance had been offered at all, had Signal known that his airman certificate had been revoked 3 years before due to falsification." (Affid. of Richard L. Robinson)

This uncontradicted evidence supports the Plaintiffs' assertion that Kovach's misrepresentation was material. Also in this case, as in *Pinette,* "in addition to the character of the information misrepresented, the fact that the application in this case specifically requested the information," 52 F.3d at 411, supports this Court's conclusion that the misrepresentation was material to Ranger's decision to insure Kovach.

Although Kovach disclosed all the relevant information to Benchmark, he relied on his agent in answering the question. The Defendants brought a third-party complaint against Benchmark and filed their first amended third-party complaint on December 31, 1997. On January 23, 1998, the Defendants', Motion for Default against Benchmark for failure to appear and failure to plead was granted. On February 23, 1998, the Defendants filed a Motion for Judgment pursuant to Federal Rule of Civil Procedure 55(b).

The Court finds as a matter of law that the Defendant Kovach made a material misrepresentation in his application for aviation insurance with the Plaintiff Ranger. Thus, the insurance policy is void ab initio.

### CONCLUSION

The Court concludes that the insurance policy issued by Ranger to Kovach does not provide coverage to the flight and accident in question and, in addition, the policy is void ab initio due to the material misrepresentation of Kovach in the application form. For the reasons presented, the Plaintiffs' Motion for Summary Judgment (Doc. No. 84) is GRANTED as to liability. The Defendants' Motion for Summary Judgment (Doc. # 94.) is DENIED. In light of the Court's rulings, on or before July 16, 1999, the parties shall submit briefs as to the appropriate relief to be granted and in addition, the Defendants shall address the issue of relief on their Motion for Judgment (Doc. No. 69) against Benchmark.

SO ORDERED.