## CHARLES HALLAS ET AL. *v.* BOEHMKE AND DOBOSZ, INC., ET AL.
(15489)

## CHARLES HALLAS ET AL. *v.* SCOTTSDALE INSURANCE COMPANY
(15490)

Callahan, C. J., and Borden, Berdon, McDonald and Peters, Js.

Argued October 31, 1996—officially released January 14, 1997

*James J. Carroll,* for the appellants-appellees in Docket No. 15489 (defendants in the first case).

*Kevin A. Coles,* for the appellees-appellants in Docket No. 15489 and the appellants in Docket No. 15490 (plaintiffs in both cases).

*Brian M. Gildea,* with whom, on the brief, was *Robin Stevens,* for the appellee in Docket No. 15490 (defendant in the second case).

*Joan M. Gilbride,* pro hac vice, and *Philip J. Walsh* filed a brief for the appellee in Docket No. 15490 (third party defendant Continental Agency of Connecticut, Inc.).

PETERS, J. In these consolidated appeals, the issues arise out of the negligent failure of an insurance broker to include the names of mortgagees on a property own-

er's application for fire insurance. The dispositive issues are the extent of liability incurred by the negligent broker and the extent to which the insurer, on agency principles, is liable for the broker's negligence.

In the first case, Docket No. 15489, the plaintiffs, Charles Hallas, Patapios Zervos and Henry Nyland[1] brought an action against the defendants, Boehmke and Dobosz, Inc., and Walter Dobosz (Dobosz),[2] alleging that Dobosz negligently had failed to provide insurance coverage for them as mortgagees of property owned by Antonio Alves, and that this negligence entitled them to damages when the insured property subsequently was destroyed by fire.[3] The trial court directed verdicts against Zervos and Nyland for failure to offer sufficient evidence on how they, as junior mortgagees, had been damaged by Dobosz' negligence. After a jury returned a verdict in favor of Hallas for $188,000, the parties stipulated that the amount of the recovery should be $188,200,[4] and the trial court rendered a judgment against Dobosz in that amount.

[1] Nyland died subsequent to filing this appeal. Griffith H. Trow, acting as fiduciary for Nyland's estate, was substituted as a party plaintiff. We will continue to refer to Nyland, however, as a plaintiff.

[2] Because the record discloses no difference in the interests of the defendants Boehmke and Dobosz, Inc., and Walter Dobosz in this litigation, we will refer to the defendants, in the singular, as Dobosz.

[3] The plaintiffs' complaint alleged that Dobosz had been negligent in: (1) representing that coverage had been obtained to reflect the plaintiffs' interest as mortgagees, when such coverage had not been obtained; (2) issuing an insurance binder purporting to cover the plaintiffs' interest as mortgagees and representing that he had the authority to issue such a binder, when he had no such authority; (3) preparing and processing a commercial insurance application that failed to notify the Scottsdale Insurance Company (Scottsdale) of the plaintiffs' interest as mortgagees; and (4) delivering the Scottsdale policy to Alves without informing the plaintiffs that their interest as mortgagees was not protected by that policy.

[4] The corrected amount is equal to the amount secured by the first mortgage originally held by Lois Simpson and subsequently assigned to Hallas. Evidently, the jury did not include in its award the $30,000 secured by the second mortgage also held by Simpson and subsequently assigned to Hallas.

In the second case, Docket No. 15490, the same plaintiffs brought a contract action against the defendant, Scottsdale Insurance Company (Scottsdale), in which they alleged that Scottsdale was responsible for the plaintiffs' fire loss because Scottsdale, through its agent, Dobosz, had issued an insurance binder covering the plaintiffs. The plaintiffs claimed that the issuance of this binder obligated Scottsdale to give them written notice of the cancellation of the insurance policy that Scottsdale had subsequently issued, even though that policy did not list the plaintiffs as insureds.[5] Scottsdale filed a third party complaint against Dobosz and Continental Agency of Connecticut, Inc. (Continental), and a counterclaim against the plaintiffs. The trial court directed a verdict in favor of Scottsdale on eight counts of the plaintiffs' complaint and against Scottsdale on its third party complaint and counterclaim.

Dobosz appealed and Zervos and Nyland cross appealed from the judgment in Docket No. 15489; Hallas, Zervos and Nyland appealed from the judgment in Docket No. 15490. Although the appeals were properly filed in the Appellate Court, we transferred them to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse, in part, the judgment

[5] The plaintiffs filed a nine count complaint. In the first four counts, Hallas alleged that Scottsdale's failure to provide him with notice of the cancellation of the Alves policy; see General Statutes § 38a-170; imposed liability upon Scottsdale to pay for the fire loss because: (1) it was bound by the terms of the binder issued by its agent, Dobosz; (2) it was obligated to act in accordance with its implied covenant of good faith and fair dealing; (3) its conduct constituted unfair and deceptive acts or practices in the business of insurance; General Statutes §§ 38a-815 and 38a-816; and (4) its conduct constituted unfair or deceptive acts or practices in the conduct of trade or commerce; General Statutes § 42-110b et seq. Counts five through eight made the same allegations on behalf of Zervos and Nyland. Count nine sought reformation of the Alves insurance policy to include the interests of the plaintiff mortgagees.

The plaintiffs have not appealed from the directed verdict on counts three, four, seven, eight and nine.

of the trial court in the first case and affirm it in the second case.

I

As a result of the evidence presented in the consolidated trial of these two cases, the jury reasonably could have found the following facts. On November 3, 1989, Alves purchased for $300,000 a rooming house located at 331–335 Clinton Avenue in Bridgeport. Alves obtained most of his financing for this purchase from Lois Simpson, trustee, the wife of Hallas. Simpson secured her loan by two mortgages on the property in the amounts of $188,200 and $30,000, respectively. The vendors of the property, Zervos and Nyland, provided a third mortgage to Alves in the amount of $103,214.24. Hallas insisted that Alves obtain fire and extended coverage insurance on the property and spoke with Dobosz on the day of the closing for this purpose.

At the request of Hallas, Dobosz filled out an "Accord Commercial Insurance Application." Because the requested coverage was excess lines insurance[6] that, as Hallas knew, Dobosz could not write directly, Dobosz forwarded the application to Continental, an excess lines insurance broker. Continental, in turn, forwarded the application to the Glanvill Agency, which was an agent of Scottsdale; Continental was not an agent of Scottsdale. Glanvill offered to bind the coverage on behalf of Scottsdale, and so informed Continental, which notified Dobosz in turn. After confirming that Alves would accept the offer, Dobosz faxed Continental a request to bind the coverage.

From his conversation with Hallas, Dobosz understood that the beneficiaries of the insurance policy were

---

[6] "Excess lines" or "surplus lines" insurance is "specialized property or liability coverage provided by a nonadmitted insurer in instances where it is unavailable from insurers licensed by the state." Barron's Business Guide, Dictionary of Insurance Terms (3d Ed. 1995).

to include not only the owner, Alves, but also the three mortgagees. Dobosz, however, failed to inform Continental, or anyone else, that any mortgagees were to be named on the Alves policy. The certificate from Continental notifying Dobosz of the issuance of coverage listed no mortgagees. Similarly, the policy issued by Scottsdale listed no mortgagees.

Nonetheless, upon receiving information that Scottsdale would provide insurance coverage, Dobosz issued a binder, effective November 3, 1989, until November 3, 1990, identifying Scottsdale as the insurer and including as insured Alves as owner and the plaintiffs as mortgagees. Hallas received a copy of this binder, but Scottsdale did not receive one. The binder provided: "This binder is cancelled when replaced by a policy." When Scottsdale subsequently delivered the Alves policy to Dobosz, Dobosz mailed it to Alves without reviewing its contents to ascertain whether it provided coverage for the mortgagees.

Alves did not have the money to pay the insurance premium. Hallas made a down payment in the amount of $2035 on Alves' behalf; for the remainder of the premium, Dobosz assisted Alves, on November 3, 1989, in entering into a financing arrangement with the Bank of Boston. The Bank of Boston undertook to pay directly to Continental that part of the premium that it had financed. The financing arrangement provided that, in the event of a default by Alves, the Bank of Boston had the right to cancel the Scottsdale policy. The Bank of Boston exercised this right when Alves failed to make his payments as they became due. On January 16, 1990, the Bank of Boston sent to Alves, Dobosz and Continental notices of its intent to cancel and, twenty days later, sent them notices of cancellation. No notices were sent to the mortgagees. On February 15, 1990, Continental mailed a copy of the cancellation notice to Glanvill, Scottsdale's agent, and requested cancellation of the

Alves policy. Scottsdale cancelled the policy and refunded the unused part of the premium relating thereto, either to Dobosz or to the Bank of Boston.

Hallas learned that the insurance had been cancelled in May or June, 1990. After a conversation with Dobosz confirming that fact, Hallas also learned that the mortgagees had never been covered by the Scottsdale policy. Upon discovering these facts, Hallas informed the other plaintiffs that the property was uninsured. Hallas also tried, unsuccessfully, to obtain reinstatement of the policy. In July, 1990, after having taken assignment of the first and second mortgages from Simpson, Hallas procured from the Mt. Hawley Insurance Company (Mt. Hawley) other insurance covering his interest in the rooming house. The other two mortgagees did not obtain insurance.

On September 24, 1990, the rooming house was extensively damaged by fire. Hallas filed a claim with Mt. Hawley to recover for his loss. That claim, filed in the United States District Court for the District of Connecticut, had not been resolved at the time that these cases were tried.

## II

In the first case, Docket No. 15489, which was grounded on a claim of negligence, Dobosz appeals from the jury verdict finding him liable in damages to Hallas, and Zervos and Nyland cross appeal from the directed verdict against them. Because the issues raised on the appeal and the cross appeal have no relationship to each other, we will consider them separately.

## A

In his appeal, Dobosz contends that the trial court improperly: (1) failed to instruct the jury that Hallas had actual notice of the cancellation of the Scottsdale policy; (2) failed to instruct the jury that it could find

Hallas equitably estopped because he had actual notice of the cancellation of the Scottsdale policy; (3) failed to instruct the jury that Hallas could not prevail on his claim of negligence without expert evidence about the duty of insurance agents to mortgagees; (4) withdrew from jury consideration exhibits documenting Hallas' lawsuit against Mt. Hawley and documenting the terms of the Mt. Hawley insurance policy; (5) precluded Dobosz from arguing to the jury that Hallas had obtained insurance with Mt. Hawley; and (6) failed to direct a verdict in favor of Dobosz on the ground that Hallas' knowledge of the cancellation of the Scottsdale insurance policy and his subsequent procuring of insurance from Mt. Hawley were intervening acts that superseded Dobosz' negligence as a matter of law.

Most of these claims of impropriety flow from the same basic premise. Dobosz does not contest, in any serious fashion, that he was negligent in failing to include the mortgagees in the application for coverage from Scottsdale and in failing to check the terms of the Scottsdale policy before he mailed it to Alves. He maintains, however, that the trial court improperly impaired his ability to show that his negligence was not the proximate cause of Hallas' losses. He argues that he was relieved of all liability because of Hallas' actual knowledge concerning the cancellation of the coverage provided by the Scottsdale insurance policy and Hallas' subsequent timely procurement of substitute insurance from Mt. Hawley. Hallas contends, to the contrary, that the trial court's rulings were proper because the Mt. Hawley policy was a collateral source of reimbursement for Hallas' losses that was independent of Dobosz' negligence and was therefore irrelevant to the damages that Dobosz had caused Hallas to suffer. We agree with neither of these propositions and, therefore, conclude that a new trial is required.

At the outset, we reject Hallas' argument that the proceeds of the Mt. Hawley policy fall within the collateral source doctrine and therefore cannot, under any circumstances, affect the measurement of the damages that Dobosz owes to Hallas. The record demonstrates that Hallas bought the Mt. Hawley policy only after discovering that Alves had defaulted in his financing arrangement for the Scottsdale policy and that he, Hallas, could not reinstate the Scottsdale policy because he had never been named as one of its insureds. There is nothing in the record to suggest that Hallas would have bought additional fire insurance even if the Scottsdale policy had provided him with full insurance coverage. In light of these uncontested facts, the Mt. Hawley policy is not an independent source of recovery for Hallas and is not a collateral source with respect to Dobosz' liability as tortfeasor. See *Gurliacci* v. *Mayer*, 218 Conn. 531, 556–57, 590 A.2d 914 (1991); *Rametta* v. *Stella*, 214 Conn. 484, 489–90, 572 A.2d 978 (1990).

Dobosz' claim for complete exoneration as a result of the outstanding Mt. Hawley policy is likewise flawed. But for Dobosz' negligence, Hallas would have been a named mortgagee entitled to receive notice, and presumably would have received notice, of Alves' failure to pay the insurance premium. Hallas would then have had a right to reinstate the policy upon paying the premium. General Statutes § 38a-324.[7] The result of Dobosz'

---

[7] General Statutes § 38a-324 provides in relevant part: "Cancellation of commercial risk insurance policies. Notice requirements. Applicable to surplus lines insurers. (a) After a policy of commercial risk insurance . . . has been in effect for more than sixty days, or after the effective date of a renewal policy, no insurer may cancel any policy unless the cancellation is based on the occurrence, after the effective date of the policy or renewal, of one or more of the following conditions: (1) Nonpayment of premium . . . . If the basis for cancellation is nonpayment of premium, at least ten days' advance notice shall be given and the insured may continue the coverage and avoid the effect of the cancellation by payment in full at any time prior to the effective date of cancellation. . . .

"(b) No surplus lines insurer shall be deemed to be eligible to write coverage for risks as provided in sections 38a-741 to 38a-744, inclusive, 38a-

negligence was that Hallas was unable to reinstate the policy because, by the time that Hallas learned the facts, the time for reinstatement had passed.[8] Although Hallas was able to procure other insurance from Mt. Hawley, nothing in the record establishes a full identity in the operative provisions of the two insurance policies. One was an owner's policy that should have listed mortgagees as additional insureds; another was a single interest policy covering only a single mortgagee. Facial inspection reveals two policies in which the premiums, the amount of the coverage and the term of insurance are all different.[9]

In *Preston* v. *Keith*, 217 Conn. 12, 584 A.2d 439 (1991), we recently restated the rules that govern a claim that the conduct of an injured plaintiff exonerates a tortfeasor, in whole or in part, from the consequences of his negligence. In the context of a personal injury action, we held that a person " 'who has been injured by the negligence of another must use reasonable care to promote recovery and prevent any aggravation or increase of the injuries.' " Id., 15, quoting *Morro* v. *Brockett*, 109 Conn. 87, 92, 145 A. 659 (1929); see also *Sette* v. *Dakis*, 133 Conn. 55, 60, 48 A.2d 271 (1946); *Lange* v. *Hoyt*, 114 Conn. 590, 595, 159 A. 575 (1932). We observed that an assessment of whether a person has done what a

---

777, 38a-794 and 38a-795, unless such insurer complies with the requirements of subsection (a) of this section."

[8] The timing of the actual notice distinguishes this case from *Johnston* v. *American Employers Ins. Co.*, 25 Conn. App. 95, 592 A.2d 975 (1991). In that case, the insureds received actual notice of the pending cancellation of their automobile insurance policy from their own insurance agent *before* the date of its actual cancellation. Id., 97–98. At a time when presumably they could have reinstated the policy by paying the premiums on which they had defaulted, they chose to purchase alternate insurance. Id., 98.

[9] For example, the Scottsdale policy was purchased for $5671 and covered the insured premises for $325,000, the term lasting November 3, 1989, through November 3, 1990. In comparison, Hallas purchased the Mt. Hawley policy for $4544, obtaining $217,500 in coverage for a period lasting from July 9, 1990, through July 9, 1991.

reasonably prudent person would be expected to do under the same circumstances falls under the rubric of the duty to mitigate damages. "[T]he theoretical foundation for the plaintiff's duty to mitigate damages is that the defendant's negligence is not the proximate, or legal, cause of any damages that could have been avoided had the plaintiff taken reasonable steps to promote recovery and avoid aggravating the original injury." *Preston* v. *Keith,* supra, 16. It follows that "[t]he burden of proving that the injured party could have avoided some or all of his or her damages . . . rests on the party accused of the tortious act." (Internal quotation marks omitted.) Id., 21; see also *Michaud* v. *Steckino,* 390 A.2d 524, 531 (Me. 1978); *Williams* v. *Masters, Mates & Pilots of America, Local No. 2,* 384 Pa. 413, 422, 120 A.2d 896 (1956). Nothing in the reasoning of *Preston* limits its holding to cases involving personal injury.

Applying *Preston* to the facts of this case, we agree with the trial court that Hallas' knowledge and conduct did not automatically relieve Dobosz of all liability, but we disagree that the Mt. Hawley policy, which the trial court withdrew from the jury, bore no relevance whatsoever to the damages proximately flowing from Dobosz' negligence. Had Hallas failed to procure any substitute fire insurance within a reasonable time after receiving notice of the cancellation of the Scottsdale policy, Dobosz could have argued, pursuant to the principles enunciated in *Preston,* that Hallas had improperly failed to take steps to mitigate damages and thus had diminished his right to recover from Dobosz. By the same token, the steps that Hallas did take to mitigate his damages, i.e., his procurement of the Mt. Hawley policy, also had the potential of diminishing his right of recovery. *Preston* demonstrates that: (1) Hallas is not entitled to a double recovery; and (2) Dobosz has the burden of proving the extent to which the Mt. Haw-

ley policy and its proceeds have made Hallas whole and have exonerated Dobosz. *Preston* v. *Keith*, supra, 217 Conn. 21.

We recognize that none of the parties brought *Preston* to the attention of the trial court and that the trial court, therefore, made no improper ruling relating thereto. Nonetheless, in the interests of fairness to all concerned, we are persuaded that it is appropriate to order a new trial to afford Dobosz the opportunity to prove that access to the Mt. Hawley policy mitigated Hallas' losses in whole or in part.[10]

## B

In their cross appeal, Zervos and Nyland, the holders of two mortgages junior in interest to the mortgages held by Hallas, challenge the propriety of the verdict directed against them by the trial court. They contend that the trial court improperly ruled that they had failed to prove that the Alves property had sufficient value to cover their junior liens. We agree with the trial court's judgment with regard to these claims.

In order to establish their claim for relief, Zervos and Nyland produced the following evidence. The amount of the Scottsdale policy was $325,000. At the time of the fire, Hallas' mortgage liens amounted to $218,200, while their liens amounted to $115,255.94.[11] Had they

[10] In light of the new trial that we have ordered, we must address Dobosz' claim that Hallas was obligated to present expert evidence to inform the jury about the duty owed by insurance agents to mortgagees. We reject this claim. As in *Todd* v. *Malafronte*, 3 Conn. App. 16, 19, 484 A.2d 463 (1984), on which Dobosz relies, Dobosz himself testified to the duties of an insurance agent. He acknowledged that these duties included obtaining proper insurance for mortgagees and ensuring that the mortgagees' interests were fully protected. There was no testimony to the contrary. Under these circumstances, no further expert evidence was required.

[11] Zervos and Nyland calculate the value of their liens by taking $103,214.24, the outstanding mortgage principal, and adding ten months interest at 14 percent.

had the opportunity to reinstate the Scottsdale policy, that policy potentially would have covered a significant portion of their liens. They were not insureds under the single interest Mt. Hawley policy, whose face amount was, in any case, only $217,500.

The right of mortgagees to recover rests, however, not only on the face amount of their lien interests but also on the value of the insured property. Zervos and Nyland concede that, as junior mortgagees, they can only recover to the extent that both (1) the amount of insurance coverage, *and* (2) the damage done to the insured premises, based on an accurate valuation of the destroyed property, exceed the amount secured by the senior mortgages.

For the purpose of establishing the value of the destroyed property, the three plaintiffs relied on the testimony of John Cotter, Jr., a licensed public adjuster, who prepared the figures in the claim that Hallas filed against Mt. Hawley. Cotter testified, on the basis of his inspection of the property after the fire, that its replacement cost value was $531,269.83. He was less precise about its actual cash value before the fire. He could not identify when he had last seen the property before it had burned, and acknowledged that the time gap might have been as much as four years. Although the property was used as a rooming house, Cotter did not know what income it had generated prior to the fire. He did not calculate the depreciation on the property because even a 50 percent depreciation factor would still have provided full coverage for Hallas. He ventured the opinion, nonetheless, that the property's actual depreciation would have been in the neighborhood of 30 to 35 percent, an amount that would have protected the junior liens under the Scottsdale policy.

The trial court apparently concluded that this testimony was, with respect to Zervos and Nyland, so specu-

lative and imprecise that, as a matter of law, their claims could not go forward. The junior lienors did not file a motion for articulation to clarify the basis of the trial court's ruling.[12] On this record, we can discern no impropriety in the judgment of the trial court. See *Berry* v. *Loiseau*, 223 Conn. 786, 818–19, 615 A.2d 414 (1992).

## III

In the second case, Docket No. 15490, which was grounded on a claim of breach of contract, the three plaintiffs appeal from the trial court's direction of a verdict in favor of Scottsdale. The parties agree that the basis for the trial court's ruling was the plaintiffs' actual knowledge, some four months prior to the fire, that the Scottsdale policy had been cancelled. We conclude that the trial court's judgment in favor of Scottsdale should be affirmed, but for reasons partially different from the conclusions reached by the trial court. See *Bernstein* v. *Nemeyer*, 213 Conn. 665, 669, 570 A.2d 164 (1990); *Favorite* v. *Miller*, 176 Conn. 310, 317, 407 A.2d 974 (1978).

In assigning dispositive weight to the plaintiffs' actual knowledge of the cancellation of the Scottsdale policy, the trial court assumed that the plaintiffs were entitled to notice in the first place. The trial court relied on *Johnston* v. *American Employers Ins. Co.*, 25 Conn. App. 95, 592 A.2d 975 (1991), but that case is inapposite because it involved the rights of the insureds named on the insurance policy.[13]

Written notice of cancellation of a fire insurance policy must be given, pursuant to General Statutes § 38a-

---

[12] Practice Book § 4051 permits a party to file a motion with the trial court seeking further articulation of a trial court decision. If Zervos and Nyland had deemed the court's decision to be incomplete or ambiguous, it was their responsibility to invoke their rights under this section. See *Barnes* v. *Barnes*, 190 Conn. 491, 493, 460 A.2d 1302 (1983).

[13] See footnote 8.

307,[14] "to a designated mortgagee not named herein as the insured." It is undisputed that the plaintiffs were not designated as mortgagees on the Scottsdale policy itself. The question, therefore, is whether their designation on the insurance binder negligently issued by Dobosz is sufficient to make them designated mortgagees with respect to Scottsdale. Resolving that question in accordance with established rules of agency, we conclude that, in the circumstances of this case, the terms of the binder do not impose liability on Scottsdale because there is no probative evidence in the record to establish an agency relationship between Dobosz and Scottsdale.

"[T]he three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. Restatement (Second), 1 Agency § 1, comment b (1958)." (Internal quotation marks omitted.) *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 240, 654 A.2d 342 (1995); see also *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 184, 544 A.2d 1185 (1988); *Botticello* v. *Stefanovicz*, 177 Conn. 22, 25, 411 A.2d 16 (1979). "A principal is generally liable for the authorized acts of his agent; 1 Restatement (Second), Agency § 140, p. 349 (1958) . . . ." *Gateway Co.* v. *DiNoia*, supra, 240.

The record contains no evidence that, in issuing the binder listing the mortgagees, Dobosz was acting as an agent for Scottsdale. Scottsdale could not very well

---

[11] Section 38a-307 sets forth the standard form to be used for fire insurance policies. Pursuant to this section, the form must contain a paragraph that provides: "Mortgagee interests and obligations. If loss hereunder is made payable, in whole or in part, to a designated mortgagee not named herein as the insured, such interest in this policy may be cancelled by giving to such mortgagee a ten days' written notice of cancellation. . . ."

have authorized Dobosz to issue a binder covering mortgagees when the interests of those mortgagees had not been disclosed to Scottsdale. The testimony was to the same effect. Dobosz testified that he was an agent for Alves and not an agent for Scottsdale and that he had no authority to bind Scottsdale's coverage. Hallas testified that, when he asked Dobosz to obtain insurance for him, he, Hallas, was aware that Dobosz could not issue the policy himself. The plaintiffs acknowledge that Dobosz arranged for their insurance, not by contacting Scottsdale directly, but by contacting Continental, an excess lines insurance broker. They further acknowledge that "Continental is not, was not and never was Scottsdale's agent." Although agency is normally a question of fact; see, e.g., *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 133, 464 A.2d 6 (1983); no reasonable juror could find actual or implied agency in these circumstances. See *Russo* v. *McAviney*, 96 Conn. 21, 24, 112 A. 657 (1921) (agency relationship decided as matter of law).

Turning to the law of apparent authority, we similarly find nothing in the record to show that Dobosz was acting as an apparent agent of Scottsdale. "Apparent authority must be derived not from the acts of the agent but from the acts of his principal. [T]he acts of the principal must be such that (1) the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority." (Internal quotation marks omitted.) *Lettieri* v. *American Savings Bank*, 182 Conn. 1, 8, 437 A.2d 822 (1980); see also *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 140; *Fireman's Fund Indemnity Co.* v. *Longshore Beach & Country Club, Inc.*, 127 Conn. 493, 497, 18

A.2d 347 (1941); 1 Restatement (Second), supra, § 8, pp. 30–32. Scottsdale neither designated Dobosz as its agent, nor provided Dobosz with blank binder forms, blank policy forms, endorsements, stamps or anything else that bore Scottsdale's name. Scottsdale did not instruct Dobosz to issue a binder covering the plaintiff mortgagees in this case. It was only with respect to Alves that Scottsdale and the other brokers told Dobosz that coverage had been bound. Although Dobosz collected premiums for Scottsdale, he did so on instructions from Continental, which concededly was not Scottsdale's agent. Dobosz' conduct in issuing binders in the ordinary course of his business is not evidence that Scottsdale held him out, in this case, as having authority to issue a binder as an agent of Scottsdale.[15] Neither by word nor by act did Scottsdale hold Dobosz out to the plaintiffs as having the authority to bind Scottsdale to any of the plaintiffs as a "designated mortgagee."[16]

Without an agency relationship of any kind between Scottsdale and Dobosz, Scottsdale owed the plaintiffs

---

[15] The excess line affidavit that is an exhibit in this case indicates, as Connecticut law requires, that three licensed insurers, Aetna Casualty and Surety Company, Middlesex Mutual Assurance Company and General Accident and Indemnity Company, had declined to insure this risk. Even if Dobosz had authority to issue insurance on behalf of these companies, such agency does not establish that he had the authority to write excess liability insurance. Cf. General Statutes § 38a-794 (establishing licensing requirements for excess lines brokers).

[16] The United States District Court cases cited in the plaintiffs' reply brief do not persuade us otherwise. See *Passarelo* v. *Lexington Ins. Co.*, 740 F. Sup. 933, 937–38 (D. Conn. 1990); *Teleco Oilfield Services, Inc.* v. *Skandia Ins. Co.*, 656 F. Sup. 753, 757 (D. Conn. 1987). In neither of these cases did all parties concede that the insurance broker was only accountable to an entity that was *not* an agent of the insurer. We decline, moreover, to hold that a broker may become an agent for an insurer simply by collecting and remitting premiums for the insurer's ultimate benefit. To the extent that the language in *Passarelo* or *Teleco Oil Field Services, Inc.*, adopts this proposition, we reject it as a matter of state law. To do otherwise would effectively make agents out of all independent insurance brokers.

no contractual duty whatsoever. It follows that, without such an agency relationship, Scottsdale had no statutory duty to give the plaintiffs notice of the cancellation of the Alves fire insurance policy. The judgment in favor of Scottsdale must, therefore, be affirmed.

In the first case, Docket No. 15489, the judgment with respect to Hallas is reversed and the case is remanded for a new trial; the judgment with respect to the defendants as against Zervos and Nyland is affirmed. In the second case, Docket No. 15490, the judgment is affirmed.

In this opinion the other justices concurred.