[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On July 2, 1999, the plaintiff Thom Huynh operated a business known as the Ngoc Phat Jewelry and Gift Shop at property owned by the defendants Manuel and Maria Reis at 1996 Park Street, Hartford, Connecticut. As the roof to the store was leaking, Reis commenced repairs through his contracting business, the defendant, RM Contractors. By July 4, 1999, Reis had removed the existing roof and had installed new plywood but no shingles. Hence, the seams were vulnerable to rain and rain it did the night of July 3 to 4 causing water damage to the building and the contents of the plaintiff's store. The court heard various accounts on the amount of water ranging from simply "some" to 1/4 inch to enough to cause shoes to be wet, or about an inch, to four to eight inches. One witness testified that the water was controlled with a mop and another stated that pumps were used. Additionally, the court heard that up to 75% of the suspended ceiling had collapsed or was pulled down. As a result of the water damage, city officials including police officers, firemen and building inspectors came to the premises. Mr. Huynh has now filed this suit seeking damages caused by the water leaking into the store.
Notwithstanding the defendants' written denials, at the commencement of trial, the defendant Manuel F. Reis, d/b/a RM, admitted it was negligent in not protecting the roof and agreed that water damage had occurred on the premises; with certain exceptions discussed hereinafter, it vehemently denied that most of plaintiff's alleged losses occurred or, if they had, that it was responsible for those losses. Additionally, the parties agreed that for the purposes of the hearing, the period of July 2 to 4, 1999, could be considered as one continuous period; no distinction was to be made between any water damage occurring on July 2 from that on July 3 to 4, 1999. Apparently as a result of this agreement, the plaintiff withdrew those counts pertaining to Mr. and Mrs. Reis individually. CT Page 3901
 1.
The plaintiff's claims focus on two areas: content (including fixtures) loss and business loss. For the most part, the parties were not in disagreement as to most of the content loss. Randy Harakas, an insurance adjuster, prepared two estimates of content loss, one for $25,916.64 and the other for $31,379.48; by agreement both were admitted into evidence. He testified that he prepared a first list after he visited the premises on July 8, 1999. In June 2002, he prepared the second list, when he decided he could not support the items in the first list either because he could not substantiate the value or because he had not seen the damaged item. The defendant has stipulated as to the damages set forth in the $25,916.64 list. In addition to inventory, the list included a number of electrical items and tools that could not be used as a result of the water damage. There was no specific testimony on the items which were at variance in the two lists.
Not included in the list, but very much in dispute, are two showcases which the plaintiff maintains were damaged as a result of the water. The testimony covered the whole spectrum from totally damaged to partially to none at all. The plaintiff argues that the larger showcase was valued at $15,000.00 and the smaller at $5,000.00. The plaintiff no longer has his store and the larger showcase is now disassembled and kept at his son's new store. Pictures of the showcases were introduced into evidence and those of the large showcase reveal little damage although some water damage is evident to a drawer and a door. The plaintiff's wife, Mrs. Huynh, testified that a couple of glass panes were broken. Harakas testified that it would cost approximately $1500 to repair the smaller showcase which is now used for storage at the new store and the larger case was given a $250 damage amount by the appraiser.
 2.
The plaintiff also claims that he incurred additional expense for electrical and security system repairs as a result of the water. Benjamin Vitti of AA Electrical and Security Service, Inc., indicated that he had a crew of approximately four persons on the job site Sunday, Monday, Thursday, Friday and Saturday. Several witnesses testified about the hanging and exposed wires related to the roof and ceiling damage. The total of his company's bills related to the incident was $9,371.76 and he indicated that the plaintiff paid him for the work, over a period of time, by both check and cash. While the defendant disputes these claims, the court believes that the plaintiff has proved, by a preponderance of the evidence, that the subject electrical work, including that to bring the building up to code and repair the alarm system, was performed and paid by the plaintiff. CT Page 3902
 3.
The plaintiff also seeks damages for the loss of gold remnant and dust generated from jewelry repair and fabrication. He introduced three bowls, one of which was a fish bowl, in which he had accumulated the scrap gold since 1994. Each bowl had been filled with either 18 or 24 carat gold scrap to about one inch from the top and then covered with water. He indicated that he had never weighed each bowl but believed that they each contained three to four pounds of gold. Mr. Huynh testified that a few days after the incident, he asked Mr. Reis if he had seen the bowls and was advised that they were in the bathroom, emptied and stacked. He claimed that the value of the gold remnant in the three jars totaled $40 to 60,000.00. A gemstone dealer, Marv Thom, who supplies diamonds and other stones to the plaintiff, testified that he had been at the plaintiff's store on a number of occasions and had seen the bowls as described by the plaintiff. Indeed, he testified that he advised the plaintiff to put the bowls in a safe place or simply sell the gold. Mr. Thom also indicated that the value of the gold remnant in two bowls was approximately $40,000.00. Mr. Huynh's son, Hai Huynh, testified that based upon a representative sample of gold remnant from his store,[1] that each bowl contained about 565 grams of gold and at 28 grams to an ounce, less a reduction of 25% to 18 carat gold (3/4 pure), and that fifteen ounces times the price of gold of $262 per ounce would result in $3965 loss for each bowl.
Mrs. Huynh testified about certain diamonds that she had placed in a beaker jar on July 3, 1999 to clean for the July 4, 1999 sale. She indicated that the diamonds needed to sit in the jar for 1 to 2 days and that the beaker was found empty, with the bowls, in the bathroom. The plaintiff claims that at least nine pieces were in the beaker with a value of $32,524.00.[2] The plaintiff maintains that "they were likely lost in the cleanup process conducted by Defendant, his family and roofing crew."
As stated by our Supreme Court in Doe v. Manheimer, 212 Conn. 748,757, 563 A.2d 699 (1989), "[t]o prevail on a negligence claim, a plaintiff must establish that the defendant's conduct legally caused the injuries . . . [L]egal cause is a hybrid construct, the result of balancing philosophic, pragmatic and moral approaches to causation. The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct . . . The second component of legal cause is proximate cause, which we have defined as [a]n actual cause that is a substantial factor in the resulting harm . . ." (Citations omitted; internal CT Page 3903 quotation marks omitted.) Id., 757. The court in Manheimer added, "[t]his court has often stated that the test of proximate cause is whether the defendant's conduct is a substantial factor in producing the plaintiff's injury . . . [t]hat negligent conduct is a cause in fact, however, obviously does not mean that it is also a substantial factor for the purposes of a proximate cause inquiry. The substantial factor test, in truth, reflects the inquiry fundamental to all proximate cause questions; that is, whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence . . . In applying this test, we look from the injury to the negligent act complained of for the necessary causal connection." (Citations omitted; internal quotation marks omitted.) Id., 758.
Could the collapse of a ceiling and the resulting damage cause store contents to be lost? Certainly. However, "[p]roximate cause results from a sequence of events unbroken by a superseding cause, so that its causal viability continued until the moment of injury or at least until the advent of the immediate injurious force." (Internal quotation marks omitted.) Wagner v. Clark Equipment Co., 243 Conn. 168, 178, 700 A.2d 38
(1997). That court noted that, "[t]he function of the doctrine of superseding cause is not to serve as an independent basis of liability, regardless of the conduct of a third party whose negligent conduct may have contributed to the plaintiff's loss. The function of the doctrine is to define the circumstances under which responsibility may be shifted entirely from the shoulders of one person, who is determined to be negligent, to the shoulders of another person, who may also be determined to be negligent, or to some other force. A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." (Internal quotation marks omitted.) Id., 179.
"If the third person's negligence is determined to be a superseding cause of the plaintiff's injury, that negligence, rather than the negligence of the party attempting to invoke the doctrine of superseding cause, is said to be the sole proximate cause of the injury . . . The doctrine serves as a dividing line between two closely related factual situations: where two forces combine to cause the plaintiff's injuries; and where one force intervenes in such a way as to relieve a negligent defendant from liability . . . Thus, the doctrine of superseding cause serves as a device by which one admittedly negligent party can, by identifying another's superseding conduct, exonerate himself from liability by shifting the causation element entirely elsewhere." (Citations omitted; internal quotation marks omitted.) Id., 179 CT Page 3904
Superseding cause was not pled by the defendant as a special defense but the parties have treated the case as if it had been pled. "[T]he interpretation of pleadings is always a question of law for the court . . . The modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery . . . Finally, if the parties at trial have adopted a certain construction of the pleadings . . . we should give deference to that construction." (Citations omitted; internal quotation marks omitted.) Dornfried v. October Twenty-Four, Inc.,230 Conn. 622, 629-30, 646 A.2d 772 (1994). This court finds that the parties have adopted this construction of the pleadings and thus will consider the issue as such. It is clear from the testimony that, assuming the gold dust and jewelry did exist, their disappearance must have occurred due to the acts of some person as the bowls and jar were found stacked in the bathroom. There was no testimony that they were found toppled over and covered with ceiling debris. The plaintiff has never specifically claimed that the defendant stole said items, he only maintains that they disappeared as a consequence of the roof collapse.
"A superseding cause may be found from the contributory negligence of the victim . . . if such negligence is greater than the combined negligence of those against whom recovery is sought . . . Contributory negligence which is not a superseding cause results in the diminution of damages recovered." (Citations omitted.) Coburn v. Lenox Homes, Inc.,186 Conn. 370, 383, 441 A.2d 620 (1982). In this case, the evidence suggests that superseding causes exist, brought about by the contributory negligence of the plaintiff. First, this court has serious questions about the plaintiff's own actions when knowing the roof was being repaired due to the earlier leaks and thus the presence of workmen, he not only allowed the items to be unsecured, but his wife actually put the diamonds out in an unsecured place rather than place them in the safe. Additionally, there was substantial testimony that the plaintiff or his wife were always present while the workers were in the store. There were of course, as testified by all, any number of individuals entering the premises from city officials to the defendant's employees, to friends to customers to other workmen. There was also evidence that the plaintiff was called to open the store each day for the workmen to enter. Most importantly, however, there was no evidence that the plaintiff or his CT Page 3905 family members attempted to find or secure the items immediately upon notification of the roof collapse. Rather, the plaintiff testified that "after a few days, he asked the owner." This court believes that the sequence of events has been broken; see Wagner v. Clark Equipment Co.,supra, 243 Conn. 178; and that superseding causes have intervened thereby breaking the chain of causation.
Additionally, viewing this in another way, there is the question of the plaintiff's failure to mitigate damages as raised by the defendant by way of a special defense. "[A] person who has been injured by the negligence of another must use reasonable care to promote recovery and prevent any aggravation or increase of the injuries . . . [A]n assessment of whether a person has done what a reasonably prudent person would be expected to do under the same circumstances falls under the rubric of the duty to mitigate damages. [T]he theoretical foundation for the plaintiff's duty to mitigate damages is that the defendant's negligence is not the proximate, or legal, cause of any damages that could have been avoided had the plaintiff taken reasonable steps to promote recovery and avoid aggravating the original injury . . . It follows that [t]he burden of proving that the injured party could have avoided some or all of his or her damages . . . rests on the party accused of the tortious act." (Citations omitted; internal quotation marks omitted) Hallas v. Boehmkeand Dobosz, Inc., 239 Conn. 658, 668-69, 686 A.2d 491 (1997). Upon notification of the collapsed roof, the plaintiff's failure to secure or account for the valuable property in question cannot be regarded as the act of a reasonably prudent person. As stated previously, this court has serious questions about the plaintiff's action in light of the circumstances and value of the property at issue. As such, there is no award for the jewelry and gold dust.
"[W]here the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct." (Internal quotation marks omitted.) Edwards v. Tardif, 240 Conn. 610, 617, 692 A.2d 1266
(1997).
 4.
The plaintiff also claims damages for lost business income from the incident through December 31, 1999. Mr. Huynh testified that the construction disruption for the roof, ceiling and other structural repairs lasted four to six weeks; his wife believed the period to be CT Page 3906 about eight weeks. Both he and his wife indicated that a dumpster was placed directly in front of his door for six to eight weeks. Mr. Reis testified and in fact introduced a bill indicating that the dumpster was on the premises for only one week and that any debris that needed to be removed after that was done with his truck. Mr. Huynh was not exactly sure how many weeks his business was impacted as his wife handled the bookkeeping and related aspects of the business. He indicated that he had lost his tools and, unable to procure new tools for many months, he borrowed some from friends.
The sales receipts for 1999 were introduced into evidence with the first quarter totaling $15,336, the second quarter totaling $55,977, the third quarter totaling $35,483 and the fourth quarter totaling $10,488. Mrs. Huynh testified that the receipts for the July 4th weekend totaled approximately $24,000.00. She testified that she continued to pay the normal expenses, including rent, electricity, and heat, after the incident. Additionally, Peoples Bank gave her and her husband a grace period of three months in which they did not have to make payments on their September 1998 $70,000 business loan.[3] While, as indicated, she had testified that the construction and cleaning work lasted approximately eight weeks and that the dumpster remained in front of her door for the same period, the store had been open during that period.
Mr. Reis testified that there had been no power in the store for at least four days following the incident and that the cleanup was not finished until at least July 12, 1999. The court also heard testimony from Ronald Mamrosh, an accountant retained by the defendant, who stated that after analyzing the tax returns, receipts, and expense information, and determining that profits existed at 63% of revenue, that the plaintiff had a reduced profit of $15,750.00 or a loss of $606 per week for the last two quarters of 1999. Mr. Mamrosh noted that the high weekend sales for the July 4 weekend were not truly indicative of 1999 gross receipts and that such short-term analyses would not be an accurate indicator of profit or loss for the business. The plaintiff argues that the gross revenue declined by $73,390 for the period July 5, 1999 to the end of the year by including the July 2-4, 1999 revenues. This court agrees with Mr. Mamrosh's testimony that using the brief spike in revenues does not accurately reflect business operation. Revenues for the first two quarters totaled approximately $71,313 and revenues for the last two quarters totaled approximately $45,971 or a difference of $25,342 and not $73,390. The court notes that certainly all the construction work had been completed long before the fourth quarter commenced.
 SUMMARY CT Page 3907
As indicated, the parties stipulated as to some of the damage. This court agrees that the estimate of value, as observed by the adjuster in the sum of $25,916.64 should be awarded to the plaintiff. As noted by the adjuster, the other list contained items that he could not verify and no evidence was introduced to rebut that testimony. This court also believes that the plaintiff should be awarded the full amount of $9371 for the electrical and security repair cost which was performed by AA Electrical as a result of the water damage. The testimony on the showcases was less than persuasive and this court awards the $1750 for those items. No damages are awarded for the gold remnant, dust and diamonds. The court awards lost profits for eight weeks of $4848 or a total award for all damages of $41,885.64 plus costs.
Berger, J.