## SUNRISE HEALTHCARE CORPORATION *v.* VICKI M. AZARIGIAN
## (AC 22959)

Foti, West and Peters, Js.

Argued February 18—officially released May 20, 2003

*Paul H. D. Stoughton,* for the appellant (defendant).

*Dominick M. Uva,* for the appellee (plaintiff).

PETERS, J. Under the medicaid act, 42 U.S.C. § 1396r (c), a nursing facility may require an individual who has legal access to a resident's assets to sign a contract requiring that individual to use those assets to pay for services rendered to the resident. The act authorizes such contracts as long as the legal representative is not required to guarantee the payments personally. The issue in this case is whether the contract between the plaintiff nursing facility and the defendant legal representative complied with this statutory requirement. The trial court concluded it did and that the defendant had acted in disregard of the contract. We agree and affirm the judgment of the court in favor of the plaintiff.

On May 3, 1999, the plaintiff, Sunrise Healthcare Corporation,[1] filed a complaint against the defendant, Vicki M. Azarigian, alleging a single count of breach of contract. The plaintiff alleged that the parties had entered into a contract for the care of the defendant's mother, Gloria Wood, at the plaintiff's nursing home. The plaintiff further alleged that the defendant, as Wood's power of attorney and "responsible party" under the contract, had failed (1) to take the necessary steps to ensure Wood's eligibility under the medicaid act and (2) to use Wood's assets to pay for services rendered by the plaintiff. The plaintiff sought damages for the defendant's alleged breach of the contract as well as for prejudgment interest pursuant to General Statutes § 37-3a and attorney's fees.

The defendant denied the allegations of the plaintiff and asserted a special defense. In that special defense, she alleged that the contract, by its terms, did not render her personally liable for any missed payments and that

---

[1] The plaintiff is the owner and operator of the nursing facility known as Mediplex of Newington.

she had upheld her obligations under the contract in good faith.

On March 28, 2002, the trial court rendered judgment for the plaintiff. The court concluded that the contract did not violate § 1396r (c) because it did not require the defendant personally to guarantee payments due to the plaintiff. The court determined, however, that the defendant had acted in breach of the contract when she transferred some of Wood's assets for estate planning purposes and used assets to pay for a personal companion for Wood. Accordingly, the defendant was ordered to pay the plaintiff $78,779.09, the stipulated amount outstanding under Wood's account.

The parties have stipulated to the following facts. On February 3, 1994, Wood gave the defendant a power of attorney. The defendant acted in such a capacity at all times relevant to this appeal. During this time, Wood had only two accounts: a Fleet Bank account and a Paine Webber account.

On December 4, 1995, the parties executed a contract for Wood's admission to the plaintiff's nursing home. The plaintiff was a resident there until her death on February 27, 1998.

In January, 1996, the defendant executed several transfers from Wood's accounts.[2] The defendant also made payments from the Fleet Bank account for a private companion to look after Wood while she was a resident of the plaintiff's nursing home. The payments for the private companion totaled $31,760.

The defendant kept Wood's account current with the plaintiff through the end of December, 1996. The defendant, however, ceased making payments between January 1, 1997, and Wood's death on February 27, 1998.

___

[2] The transfers included five gifts of $5880 each, one gift of $15,456.25, and one gift of $4835. These transfers totaled $49,691.25.

The expenses for Wood's care that accumulated during this time totaled $78,779.09.

In March, 1997, the defendant had applied for Title XIX assistance on Wood's behalf. On March 1, 1999, the Connecticut department of social services (department) issued a preliminary decision denying the application because of the transfers from Wood's accounts between November, 1994, and January, 1996. The department noted the previously mentioned transfers and an additional $285,000 that was placed in a revocable trust in August 1995 by Wood's husband.[3]

The defendant now appeals from the court's judgment in favor of the plaintiff. She claims that the court's judgment was improper because it violated § 1396r (c) and misconstrued the terms of the contract. As a matter of federal law, the defendant argues that the contract is unenforceable because it does not meet the requirements of the federal statute. As a matter of contract law, the defendant argues (1) that the contract contemplated and authorized the types of transfers that she executed, and (2) that she is not liable for Wood's expenses because she was acting as Wood's agent.

The defendant challenges both the court's findings of fact and legal conclusions. Our standard of review of such challenges is well established. "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Johnson*

---

[3] Wood's husband died on January 7, 1996. Gloria Wood was not named as a beneficiary of the trust. The parties agree that, if the revocable trust had not been attributed to Wood, she would have been eligible for Title XIX assistance.

*Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 344, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002); see also *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

I

Before we can address the merits of this appeal, we must establish the legal landscape in which the parties entered into the contract at issue. Accordingly, we begin our analysis with an overview of the medicaid program.

"The program, which was established in 1965 as Title XIX of the Social Security Act and is codified at 42 U.S.C. § 1396 et seq. (medicaid act), is a joint federal-state venture providing financial assistance to persons whose income and resources are inadequate to meet the costs of, among other things, medically necessary nursing facility care. . . . The federal government shares the costs of medicaid with those states that elect to participate in the program, and, in return, the states are required to comply with requirements imposed by the medicaid act and by the secretary of the Department of Health and Human Services. . . . Specifically, participating states are required to develop a plan, approved by the secretary of health and human services, containing reasonable standards . . . for determining eligibility for and the extent of medical assistance to be provided.

"Connecticut has elected to participate in the medicaid program and has assigned to the department the task of administering the program. . . . Pursuant to General Statutes §§ 17b-262 and 17b-10, the department has developed Connecticut's state medicaid plan and has promulgated regulations that govern its administration. . . .

"The medicaid act requires that a state's medicaid plan make medical assistance available to qualified indi-

viduals. . . . The term medical assistance means payment of part or all of the cost of . . . care and services . . . [including] nursing facility services . . . . Participating states are required to provide coverage to certain groups and are given the option to extend coverage to various other groups. [Those within the required groups] are referred to as the categorically needy . . . .

"Under the medicaid act, states have an additional option of providing medical assistance to the medically needy—persons who, like the plaintiff, lack the ability to pay for their medical expenses but do not qualify as categorically needy solely because their income exceeds the income eligibility requirements of the applicable categorical assistance program. . . . The medically needy become eligible for medicaid, if the state elects to cover them, by incurring medical expenses in an amount sufficient to reduce their incomes below the income eligibility level set by the state in its medicaid plan. . . . Only when they spend down the amount by which their income exceeds that level, are [medically needy persons] in roughly the same position as [categorically needy] persons . . . [because then] any further expenditures for medical expenses . . . would have to come from funds required for basic necessities." (Citations omitted; internal quotation marks omitted.) *Ahern* v. *Thomas*, 248 Conn. 708, 713–15, 733 A.2d 756 (1999).

The medicaid act also establishes a framework for the admission practices of nursing facilities. The act sets forth a long list of requirements for nursing facilities and rights that cannot be waived by residents. See 42 U.S.C. § 1396r. The Connecticut Patients' Bill of Rights mirrors this framework. See General Statutes § 19a-550. One such requirement prohibits a nursing facility from requiring "a third party guarantee of payment to the facility as a condition of admission (or expedited admission) to, or continued stay in, the facil-

ity . . . ." 42 U.S.C. § 1396r (c) (5) (A) (ii); see also General Statutes § 19a-550 (b) (26).[4] This prohibition of third party guarantees does not, however, prevent "an individual, who has legal access to a resident's income or resources available to pay for care in the facility, to sign a contract (without incurring personal financial liability) to provide payment from the resident's income or resources for such care." 42 U.S.C. § 1396r (c) (5) (B) (ii).

## II

Against this backdrop, we now address the claimed misconduct of the defendant. We note that the defendant does not contest that a nursing facility and a prospective resident's legal representative can enter into a contract requiring that representative to use the resident's assets for the payment of services of the nursing facility. 42 U.S.C. § 1396r (c) (5) (B) (ii). The defendant claims, rather, that the terms of this specific contract violate 42 U.S.C. § 1396r (c) (5) (A) (ii) and, in the alternative, that she acted in accordance with the terms of the contract. We disagree with both claims.

## A

The defendant first argues that the contract does not meet the requirements imposed by the medicaid act, namely, the prohibition of personal liability under § 1396r (c) (5) (A) (ii). The plaintiff maintains, to the contrary, that the court properly construed the contract and properly concluded that the defendant was liable for Wood's outstanding account. Our review of the court's interpretation of the contract is a question of

[4] General Statutes § 19a-550 (b) provides in relevant part: "There is established a patients' bill of rights for any person admitted as a patient to any nursing home facility or chronic disease hospital. The patients' bill of rights shall be implemented in accordance with the provisions of Sections 1919 (c) (2), 1919 (c) (2) (D) and 1919 (c) (2) (E) of the Social Security Act. Said patients' bill of rights shall provide that each such patient . . . shall not be required to give a third party guarantee of payment to the facility as a condition of admission to, or continued stay in, the facility . . . ."

law for which our review is plenary. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000); *Maloney* v. *PCRE, LLC*, 68 Conn. App. 727, 734, 793 A.2d 1118 (2002).

As we stated previously, the act permits contracts concerning the payment of nursing care services by a legal representative in control of a resident's assets or income. 42 U.S.C. § 1396r (c) (5) (B) (ii). Such a contract violates the medicaid act, however, when that legal representative must personally guarantee such payments. 42 U.S.C. § 1396r (c) (5) (A) (ii).

The contract in the present case unambiguously complies with these statutory requirements. First, it expressly prohibits personal liability on the part of the defendant for payments made to the plaintiff from Wood's account. Section IV, paragraph two provides that the "responsible party does not personally guarantee or *serve as surety* for payment as described in Section II, Paragraphs (1) through (5). The responsible party agrees that his or her liability for the failure to perform any of the other obligations set forth in this agreement shall be determined in accordance with these Paragraphs."

Second, the contract obligates the defendant to use *Wood's assets* for the payment of services. Section II, subparagraph 8 (8) provides: "If the responsible party has control of or access to the resident's income and/ or assets, the responsible party agrees that these funds shall be used for the resident's welfare, including but not limited to making prompt payment in accordance . . . with the terms of this agreement." This is not, as the defendant argues, a contractual agreement imposing personal liability. The defendant is liable only for her handling of Wood's assets and only to the extent that Wood's assets would cover outstanding payments owed to the plaintiff. Because the plaintiff seeks to

recover moneys that belonged at all times to Wood rather than to the defendant, the defendant's liability depends on a showing of her misuse of Wood's assets in violation of the contract.

The defendant's potential liability under the contract for an unauthorized use of Wood's assets is analogous to a trustee's liability for an unauthorized use of trust property. Just as the defendant is bound by the terms of the contract, so a trustee must act in accordance with the terms of the trust instrument. *New Haven Savings Bank* v. *LaPlace*, 66 Conn. App. 1, 14, 783 A.2d 1174, cert. denied, 258 Conn. 942, 786 A.2d 426 (2001), citing *State* v. *Thresher*, 77 Conn. 70, 83, 58 A. 460 (1904); 2 Restatement (Second), Trusts § 164, p. 341 (1959). A trustee cannot deviate from the terms of the trust merely because the beneficiary would derive greater benefit from a failure to abide by the directive of the trust instrument. 2 Restatement (Second), Trusts, supra, § 167, comment (b), p. 354. Similarly, the defendant in the present case cannot avoid liability for an unauthorized use of Wood's assets simply because that use would benefit Wood in some way.

To support the argument that her use of Wood's assets was proper under the contract, as a matter of medicaid law, the defendant relies on *Manor of Lake City, Inc.* v. *Hinners*, 548 N.W.2d 573 (Iowa 1996). This is the only case that we, or the parties, have found that addresses contracts for nursing care under § 1396r (c). In that case, the Supreme Court of Iowa considered whether the defendant, the son and "responsible party" of the resident, could be held personally liable for outstanding payments under a contract for admission to the plaintiff nursing home. The jury found him so liable and the defendant appealed, arguing that the contract violated the medicaid act. Id., 575. Although the court acknowledged the general propriety of this sort of agreement, it concluded that this specific contract was

invalid because it expressly required the "responsible party" to be personally liable for payments rendered. Id., 576.

*Manor of Lake City, Inc.*, is distinguishable from the present case. The contract in that case clearly violated § 1396r (c). It provided that "[t]he Responsible Party agrees to be bound *in his or her individual capacity* by all of the terms and conditions of the Agreement pertaining to the Resident." (Emphasis added.) Id., 575 n.1. The Supreme Court of Iowa noted that, but for the personal liability clause, the contract in that case would have conformed to the law. Id., 576. In the present case, by contrast, the contract states just the opposite. It specifically eschews personal liability on the part of the "responsible party" regarding payments to the plaintiff. Because of this significant difference in contract language, we conclude that *Manor of Lake City, Inc.*, does not support the defendant's position.

We hold, therefore, that the wording of the contract in this case complies with § 1396r (c). Accordingly, if the defendant acted in breach of the contract by not using Wood's assets as the contract required, then she is responsible for reimbursing the plaintiff.

### B

The defendant also argues that the trial court improperly concluded that, as a contract matter, she had failed to meet her obligations to the plaintiff. She maintains that the transfers of assets and the payments for the personal companion were for Wood's welfare and, therefore, were required by the contract. We disagree.

The court concluded that the "defendant . . . breached her contract with the plaintiff by both making the transfers and paying the $31,760 for a 'companion.' " The court's conclusion was based on its interpretation of the contract, specifically subparagraph 8 (8). In the

absence of a claim of ambiguity, our review of the court's conclusion is plenary. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 495; *Maloney* v. *PCRE, LLC*, supra, 68 Conn. App. 734.

Subparagraph 8 (8) provides that "[i]f the responsible party has control of or access to the resident's income and/or assets, the responsible party agrees that these funds shall be used for the resident's *welfare, including but not limited to making prompt payment in accordance . . . with the terms of this agreement*." (Emphasis added.) Accordingly, the defendant was obligated to make "prompt payments" to the plaintiff. Other than payment to the plaintiff, the defendant was permitted to use the assets only for Wood's welfare. Although the contract does not define welfare, in paragraph eight it requires the defendant, as the "responsible party," to obtain and maintain Wood's eligibility under medicaid. To ascertain the scope of the term welfare, it is necessary, therefore, to consider the defendant's contractual obligations within the context of the medicaid act.

As stated previously, the medicaid act allows states to provide medical assistance to those who are not "categorically needy" if they would lack the income for basic necessities if they were left to pay their own medical expenses. *Ahern* v. *Thomas*, supra, 248 Conn. 715. Accordingly, one of the purposes of the medicaid act is to free up income so that a needy individual can afford basic necessities other than medical expenses. Id. Thus, the term welfare under the contract refers to those basic necessities, such as nursing care, that would allow Wood to live day to day. Any use of Wood's assets that goes beyond fulfilling her basic needs is, therefore, in violation of the contract.

The defendant maintained at oral argument before this court that the transfers were for Wood's welfare

because Wood had established a pattern of similar transfers prior to her residency with the plaintiff. Despite this pattern and the pleasure that Wood might well derive from making the gifts, such transfers do not constitute a basic necessity within the context of the medicaid act. The defendant also argues in her brief that the personal companion directly benefited Wood's welfare. Although Wood did directly benefit from the personal companion, this was in addition to the care provided by the plaintiff. There is no evidence on the record suggesting that the personal companion was a necessity for Wood's well-being.

We agree with the court's conclusion that the defendant's disbursement of assets did not benefit Wood's welfare as contemplated by the contract and the medicaid act. Accordingly, the court properly concluded that these disbursements were not authorized by the contract, but rather were made in breach thereof.

C

The defendant finally argues that she cannot be held liable under the contract because she was acting as Wood's agent. She relies on the fact that the contract indicated that the defendant had Wood's power of attorney. As such, the defendant maintains that she cannot be liable for the missed payments. The plaintiff argues, however, that the defendant expressly assumed responsibility under the contract when she signed the contract as the "responsible party." We agree with the plaintiff.

The trial court found, as a matter of fact, that the defendant had executed the contract both as Wood's power of attorney and as the "responsible party" under the contract. It recognized that the execution of a power of attorney creates a principal-agent relationship. *Long* v. *Schull*, 184 Conn. 252, 256, 439 A.2d 975 (1981); *Brown* v. *Villano*, 49 Conn. App. 365, 368, 716 A.2d 111, cert. denied, 247 Conn. 904, 720 A.2d 513 (1998). It concluded,

however, that the defendant was nonetheless liable under the contract in her capacity as the "responsible party."

Because agency is a question of fact; *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 674, 686 A.2d 491 (1997); we can reverse the court's finding only if it is clearly erroneous. *Federal Deposit Ins. Corp.* v. *Mutual Communications Associates, Inc.*, 66 Conn. App. 397, 401–402, 784 A.2d 970 (2001), appeal dismissed, 262 Conn. 358, 814 A.2d 377 (2003). Our review of the record has not uncovered any factual findings with respect to agency that warrant reversal. The defendant clearly signed the contract as the "responsible party." In so doing, the defendant assumed the obligations of the "responsible party" as set forth under the contract. These obligations extend well beyond the defendant's role as Wood's power of attorney, which she exercised in signing the contract to begin with. We conclude, therefore, that the trial court reasonably could have determined that the defendant, in carrying out her obligations under the contract, was not acting exclusively as Wood's power of attorney.

In summary, the defendant has not proffered any argument that supports the reversal of the trial court's judgment for the plaintiff. First, we conclude that the contract complies with the requirements of § 1396r (c). It does not require the defendant to guarantee personally payments to the plaintiff. Second, we agree with the trial court's conclusion that the defendant acted in violation of the contract by transferring assets for estate planning purposes and using Wood's assets to pay for a personal companion. Finally, the record supports the court's finding that, under the contract, the defendant's disbursements were not made pursuant to her role as Wood's agent.

The judgment is affirmed.

In this opinion the other judges concurred.